

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

KIMBERLY LINDSAY-STERN,

Plaintiff,

v.

LASZLO GARAMSZEGI and
AURORA SPINE, INC.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: SACV 14-01970-CJC(DFMx)

**ORDER GRANTING PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S FIRST CAUSE OF ACTION AND DENYING SUMMARY JUDGMENT AS TO PLAINTIFF'S REMAINING CAUSES OF ACTION**

## I.  INTRODUCTION

Plaintiff Kimberly Lindsay-Stern brings this action against Defendants Laszlo Garamszegi, an individual, and Aurora Spine, Inc. ("Aurora"), a corporation, for violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*,

violations of California Penal Code § 502(c), violations of the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*, and invasion of privacy.  Before the Court is Defendant Garamszegi's motion for summary judgment.  (Dkt. 77.)  For the following reasons, the motion is GRANTED IN PART, as to Plaintiff's first cause of action.[1]

## II.  BACKGROUND

This case arises from Defendant Garamszegi's alleged hack of Phygen LLC's email.  Specifically, Plaintiff's operative complaint states that Defendant configured his iPhone to access Plaintiff's Phygen email account from January 2012 to May 2014.  (Dkt. 69 ¶¶ 9–17.)

Plaintiff is an employee of Phygen, which is a California-based spinal implant manufacturer.  (Dkt. 80-2 ¶¶ 1, 6–8.)  During the time relevant to this lawsuit, she worked as Phygen's Human Resources Manager and Executive Administrator, which included working as an assistant to Phygen's CEO, Thomas Gardner.  (*Id.* ¶¶ 9–11.)  Defendant was a founder of Phygen and its head engineer and Chief Technology Officer from 2005 until his resignation on March 7, 2012.  (*Id.* ¶¶ 3–5, 22.)

During the relevant time period, Phygen utilized a Microsoft Exchange Server to provide its employees with work email accounts.  (*Id.* ¶¶ 90, 96.)  The Exchange Server ran on a Dell computer owned by Phygen and located in Phygen's offices.  (*Id.* ¶¶ 92–94.)  It provided a gateway for incoming messages, served as a repository and storage for emails sent and received by Phygen accounts, and authenticated connections from various "clients" (*e.g.*, desktop computers and iPhones) through which employees accessed their

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for October 17, 2016, at 1:30 p.m. is hereby vacated and off calendar.

Phygen email.  (*Id.* ¶¶ 104, 108–09.)[2]  Its mailbox database contained emails awaiting retrieval, emails received from the internet, and copies of messages sent by Phygen email accounts.  (*Id.* ¶ 106.)  Plaintiff accessed her Phygen email through both her work desktop computer and her personal iPhone.  (*Id.* ¶ 35.)[3]

The circumstances through which Phygen came to believe that its email system was compromised, while captivating,[4] are mostly irrelevant to analysis of Defendant's motion for summary judgment.  As relevant here, on May 22, 2014, Phygen received a demand letter from a competitor that included copies of internal Phygen emails.  (*See* Dkt. 80-2 ¶¶ 63–64.)  The next day, Phygen commenced an investigation to ascertain how the competitor accessed the emails.  (*Id.* ¶ 71.)

Plaintiff was suspected as being the individual who delivered the emails to the competitor.  (Dkt. 80-5 ¶ 6.)  Eventually, the investigation revealed that Plaintiff was a

---

[2] Plaintiff objects to Defendant's statement that the "clients" that can connect to the Exchange Server include desktop computers and iPhones on the grounds that "client" is vague and ambiguous.  (*E.g.*, Dkt. 80-2 ¶ 108.)  However, Plaintiff does not object to "client" when it is introduced as a device that connects to the Exchange server.  (*Id.* ¶ 104.)  For the purposes of this Order, the Court deems "client" sufficiently clear, referring to Phygen's work computer provided to Plaintiff, Plaintiff's iPhone, and the iPhone authenticated to username "laszlo."

[3] iPhones synchronize with Exchange Servers using the Exchange ActiveSync protocol and Direct Push technology.  (Dkt. 80-2 ¶¶ 111–12.)  Specifically, an authenticated iPhone sends a ping to the server requesting notification of any change in the associated email account.  (*Id.* ¶ 114.)  When a change occurs, such as when a new email arrives, the Server notifies the device, which then requests synchronization with the Server.  (*Id.* ¶ 115–16.)

[4] By late May 2012, Defendant, having resigned from Phygen, had joined Phygen's competitor Northcutt, who founded Aurora.  (Dkt. 80-2 ¶¶ 26–27.)  (There is also a dispute as to when exactly Defendant began working for Northcutt.  (*See* Dkt. 80-2 ¶ 26.))
On May 22, 2014, Aurora's then-lawyer Mr. Curran sent a demand letter to Phygen accusing it of stealing Aurora's intellectual property.  (*Id.* ¶ 63.)  Attached to the letter were a series of internal Phygen emails.  (*Id.* ¶ 64.)  The provenance of these emails is disputed; Aurora's Chief Legal Officer Mr. Meyer testified that they were confidentially and anonymously dropped off at Aurora's office, (Dkt. 80-3 Ex. 5 at 4), but Mr. Curran testified that he lied about that and that they were not confidentially and anonymously delivered to Aurora, (*id.* Ex. 3 at 4).

party to all of the emails included in the demand letter.  (Dkt. 77-4 Ex. 4 Ex. B[5] at 75). The investigation, centered on her email account, caused Plaintiff "extreme anxiety and concern."  (Dkt. 80-1 at 20).  Plaintiff testified that she helped coordinate investigative efforts, provided information as necessary, and spent time during her working day on the matter.  (Dkt. 80-2 ¶¶ 76–79.)  However, she did not personally select or retain the outside investigator, nor did she personally reestablish the integrity of her Phygen computer, her personal iPhone (through which she accessed work email remotely), or the Exchange Server.  (*See id.* ¶¶ 79–80.)  Plaintiff also did not lose any salary or other compensation as a result of the investigation.  (*See id.* ¶ 81.)

Investigators eventually discovered that an iPhone authenticated with the Exchange Server under the username "laszlo" accessed Plaintiff's emails through the Exchange Server.  (*See* Dkt. 77-4 Ex. 4 Ex. F at 113–15; Dkt. 82-1 ¶ 37.)  As part of separate ongoing litigation, Phygen has produced the underlying log of relevant Exchange Server activity.  (*See* Dkt. 80-6 Ex. 1 at 13.)  Defendant contests its veracity.  (Dkt. 80-3 Ex. 8 at 4.)  However, both parties submitted expert reports analyzing the log.

Defendant's expert Mr. Campbell reports that the log indicates that an iPhone 4S was configured and authenticated with the Phygen Exchange Server under the username "laszlo" from October 14, 2011 until March 6, 2012.  (Dkt. 77 Ex. 8 (containing Campbell report as "Ex. A") at 13.)  That same iPhone, Mr. Campbell states, was logged as being authenticated to access the email account on the Exchange Server with the username "kimberly" (Plaintiff's username) from January 5, 2012, until May 23, 2014. (*Id.* Ex. A at 14.)

---

[5] Defendant's filing is paginated, broken up into numbered attachments, and separated into sections denoted by letter designations.  (*See* Dkt. 77.)  To clearly delineate citations, they include docket number, page number, exhibit number, and exhibit letter.

Plaintiff's expert, Mr. Peck, examined the log and determined that the iPhone in question searched the Exchange Server 2,778 times and downloaded attachments 276 times between February 2012 and May 2014.[6]  (Dkt. 80-6 ¶¶ 14–15.)  At least once, on March 5, 2012, Mr. Peck reports that the iPhone was logged forwarding a message and then, one and a half minutes later, it was logged telling the server to move an item, which could indicate deletion of an email message.  (*Id.*)  Also, on or about May 22, 2014, the iPhone was recorded attempting to download an attachment from the server nineteen times.  (*Id.* Ex. 1 at 14.)

Defendant denies that he knowingly or intentionally accessed Plaintiff's email after his resignation on March 7, 2012.  (Dkt. 80-3 Ex. 8.)  Phygen's CEO has declared that Defendant was never given permission or authorization to access Plaintiff's email.  (Dkt. 80-5 at 3.)

Defendant's motion also relies on the Phygen employee handbook.  Plaintiff, on or before January 4, 2012, signed a confirmation of receipt indicating that she received and acknowledged her responsibility to familiarize herself with the policies outlined therein.  (*Id.* ¶¶ 40, 43–44.)  The handbook includes a policy entitled "Use of Computer Equipment & Electronic Media," which specifies that (1) "[a]ll electronic information created by any employee using any means of electronic communication is the property of" Phygen, (2) personal passwords may be overridden and do not impact Phygen's ownership, and (3) Phygen may access and review electronic communications.  (*Id.* ¶¶ 45, 50–54.)

---

[6] Defendant challenged Mr. Peck's report as relying on test results from slightly different hardware and software (iPhone 4 v. 4S; iOS 7.1.2 v. 5.0–7.1.1).  (Dkt. 82-4 at 1–2.)  Plaintiff's additional submitted materials, (*see* Dkt. 87), however, demonstrate that there are sufficient "good grounds" for Mr. Peck's report, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993).  Defendant's further challenge to Plaintiff's additional submissions, (Dkt. 88), are denied as they go to the sufficiency and weight of the evidence.

Defendant and Phygen are parties to ongoing, separate litigation in California state court that commenced in May 2014.  (Dkt. 77-1 at 6.)  In October 2014, Plaintiff brought this lawsuit, (Dkt. 1-1), which Defendant removed to this Court in December 2014, (Dkt. 1).  The current operative complaint is Plaintiff's fourth amended complaint, which it was filed on May 4, 2016.  (Dkt. 69.)  Plaintiff, based on Defendant's alleged access to her email, brings four causes of action under both Federal and California law.  (*See id.*)  Defendant filed the instant motion for summary judgment or, in the alternative, partial summary judgment, on August 8, 2016, and the parties stipulated to a modified briefing schedule.  (Dkts. 76, 77.)

## III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where, as here, the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *see also Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997). In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).

In considering a motion for summary judgment, the Court must examine all the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 252; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv.*, 809 F.2d at 630–31. The Court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## III. DISCUSSION

Defendant raises arguments challenging each of Plaintiff's four causes of action. Defendant also argues that, to the extent any Federal claims remain, they preempt Plaintiff's state-law claims. The Court considers each in turn.

### A. ELECTRONIC COMMUNICATIONS PRIVACY ACT

Plaintiff's first cause of action alleges that, by accessing the Exchange Server, Defendant intercepted Plaintiff's emails in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 *et seq.* (Dkt. 69 ¶¶ 18–24.) The ECPA imposes criminal liability on any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Section 2520 also grants

statutory standing to maintain a private civil action only for a person "whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter . . . ."  18 U.S.C. § 2520(a).

Defendant argues that he did not "intercept" any communications within the meaning of the ECPA.  (Dkt. 77-1 at 9.)  "Intercept" is statutorily defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  The Ninth Circuit has construed "intercept" narrowly, applying only to "acquisition contemporaneous with transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).  Storage on a server, even transient storage, precludes interception. *See Konop*, 302 F.3d at 878 n.6.  Since email is virtually instantaneous, the ECPA's application is limited. *See NovelPoster v. Javitch Canfield Grp.*, 2014 WL 3845148, at *10 (N.D. Cal. Aug. 4, 2014); *Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1152 (C.D. Cal. 2007).  Caselaw "generally stand[s] for the proposition that once an e-mail has been received by the destination server, a communication becomes 'stored' and contemporaneous interception is no longer possible." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1077 (N.D. Cal. 2015).

Defendant's argument is that even if Plaintiff is correct that he configured his iPhone to receive her emails from the Phygen server, that synchronization occurs *after* the emails reach their final destination, the Phygen server.  (Dkt. 77-1 at 10.)  Plaintiff's rejoinder is that the Phygen server is merely transient storage and Plaintiff's phone (and presumably her desktop computer) are the final destinations.  (Dkt. 80-1 at 9.)

Once the emails arrived at the Phygem server, they had reached their destination. The various devices through which Plaintiff and Defendant accessed the emails each interacted with the server, which kept track of the attributes of the message (*e.g.* read or

unread) and ensured that the message was sent to each device appeared consistently. In contrast, transient storage is merely a step in a chain of transmission. Furthermore, as Plaintiff's expert indicates, Defendant's iPhone executed numerous commands *to the server* to search through Plaintiff's mailbox. (Dkt. 80-6 ¶ 14 ("Mr. Garamszegi performed searches for other emails within Lindsay-Stern's email account that were stored on Phygen's exchange server.").) The nature of Plaintiff's access to her email— both through her work desktop computer and her iPhone—further underline this conclusion. When Plaintiff received an email on her iPhone, it would appear "read" on her desktop computer; if she downloaded an attachment on her iPhone, she could download it again, later, from the server onto her desktop computer. Therefore, Defendant's configuring his iPhone to sync with the Phygen Exchange Server does not come within the meaning of "intercept" in the ECPA.

This holding is consistent with most other decisions in this circuit that have analyzed analogous facts. In *Mintz v. Mark Bartelstein & Associates Inc.*, 906 F. Supp. 2d 1017 (C.D. Cal. 2012), the court held that an employer directing an employee to access a former employee's personal Gmail account did not intercept the former employee's emails since they had already arrived to the Gmail server, regardless of how many devices accessed the server. *See id.* at 1031. Similarly, in *Bunnell*, illicitly accessing an email server and modifying its settings to send copies of all incoming and outgoing emails to the intruder was not intercepting the emails as they were not in transit while on the email server. *See Bunnell*, 567 F. Supp. 2d at 1053–54.

Other circuits have elevated the *contemporaneous* requirement over the particulars of whether an email is in *transmission*. *See, e.g.*, *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010) (holding that there had been an interception where an employee had set up his supervisor's email account to forward a copy of all of her messages to his email account); *Shefts v. Petrakis*, No. 10-CV-1104, 2012 WL 4049484 (C.D. Ill. Sept.

13, 2012) (citing *Szymuszkiewicz* for the proposition that "though the technical details are important, the key point is whether the device in question allows the communications to be acquired contemporaneously with transmission" and holding that altering an email server such that intruder's dummy account received a pointer to an email message simultaneously to the intended account receiving the pointer constituted interception). However, the Ninth Circuit has made clear that transmission is the critical inquiry and here the messages were no longer in transit.

The Court GRANTS Defendant SUMMARY JUDGMENT as to Plaintiff's FIRST CAUSE OF ACTION.  It is unnecessary to consider Defendant's argument challenging Plaintiff's statutory standing under the ECPA.

**B.     CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**

Plaintiff's second cause of action alleges that Defendant's access to her emails violated California Penal Code § 502.  (Dkt. 69 ¶¶ 25–35.)  That statute provides a cause of action to "the owner or lessee" of the computer, network, or data "who suffers damage or loss" caused by a violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA").  Cal. Penal Code § 502(e)(1).  Defendant does not seek summary judgment on whether he violated the CDAFA but rather on the grounds that Plaintiff does not own the data at issue and has not suffered damage or loss.

Defendant cites Phygen's Computing Policy's statement that "[a]ll electronic information created by any employee using any means of electronic communication is the property of" Phygen as evidence that Phygen, to the exclusion of Plaintiff, owns the data in question.  (Dkt. 77-1 at 13; Dkt. 77-4 Ex. 4 Ex. G at 155.)  Plaintiff, in response, indicates that her emails from January 2012 to May 2014 contained various data in which she has ownership, including healthcare information, personal family pictures, and

personal financial information.  (Dkt. 80-4.)  Phygen's CEO also submitted a declaration that Phygen "never considered itself the owner of the employee's personal email or the data within," even when their work email was used for personal matters.  (Dkt. 80-5 at 2.)

Phygen's employee manual is not dispositive of ownership.  Plaintiff has sufficiently demonstrated some ownership interest in at least some of the data transmitted through her email account between January 2012 and May 2014.  While the Computing Policy's language is broad, in context it refers to Phygen's intellectual property, not any data in any electronic communication anywhere created by its employees.  Indeed, Phygen's CEO confirms that this reading of its policy is appropriate.  (Dkt. 80-5.)  Individuals can have an ownership interest in the data within their emails even if the emails are not themselves owned by the individual.  *See, e.g.*, *Yee v. Lin*, No. C 12-02474 WHA, 2012 WL 4343778, at *3 (N.D. Cal. Sept. 20, 2012); *Mintz*, 906 F. Supp. 2d at 1031–32 (individual's personal Gmail account accessed by former employer; he had ownership interest in employment contract with new employer attached to an email).  Plaintiff owns affected data, meeting California Penal Code § 502(e)(1)'s requirement and enabling this claim.

Defendant also argues that Plaintiff has not alleged any cognizable damage or loss under CDAFA, § 502(e)(1).  (Dkt. 77-1 at 13–15.)  Specifically, Defendant argues that "damage" and "loss" are limited to economic harm.  (*See id.*)  The CDAFA is California's version of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").  While there are differences between the statutes, courts in this circuit have applied the CFAA definitions of "loss" and "damage" to the CDAFA.  *See, e.g.*, *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 951 (N.D. Cal. 2014) (pleading was deficient in alleging damage or loss for CDAFA claim "for the same reason" as CFAA claim was defective); *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Since the necessary elements of [CDAFA] do not differ

materially from the necessary elements of the CFAA for purposes of" damages or loss . . . ."); *cf. United States v. Christensen*, No. 08-50531, 2015 WL 11120665, at *16 (9th Cir. Aug. 25, 2015) (refusing to analyze the "access" requirement comparably since the CDAFA does not require *unauthorized* access as the CFAA does; it merely requires *knowing* access); *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17102, 2016 WL 3741956, at *8 (9th Cir. July 12, 2016) (same).

The CFAA includes a statutory definition of "damage:" "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Defendant cites that statutory text for the proposition that emotional harm does not qualify as damage under CDAFA. Most likely, Defendant is relying on cases rooted in an earlier version of § 1030, which expressly limited damages to economic damages. *See* 18 U.S.C. § 1030(g) (1996) ("Damages for violations of any subsection . . . are limited to economic damages."). However, the current version of the statute eliminates that limitation for all but one narrow claim, which Defendant implicitly admits does not apply here. *See* 18 U.S.C. § 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."). The current text explicitly allows "compensatory damages" in most situations. *Id.* Compensatory damages generally include damages for pain, suffering, and other emotional harms. *See, e.g.*, *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 437 n.11 (2001). There is no reason to artificially constrict the scope of CFAA damages—and, by extension, CDAFA damages—and no binding precedent mandates such a holding. *Compare In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1065 (unauthorized collection of personal information sufficed for CDAFA damage) *and Garland-Sash v. Lewis*, 348 F. App'x 639, 641–42 (2d Cir. 2009) (evaluating statutory evolution and deeming emotional damages appropriate under current CFAA) *with Mortensen v. Bresnan Commc'n, L.L.C.*, No. CV 10-13-BLG-RFC, 2010 WL 5140454, at *6–7 (D.

Mont. Dec. 13, 2010) (holding that only economic losses are recoverable under the CFAA; citing 1996 version of CFAA) *and A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645–46 (4th Cir. 2009) (accepting that CFAA damages are limited to economic damages, construing term broadly rather than narrowly).  In any event, on top of Plaintiff's emotional harm, Plaintiff's expert reports that the Exchange Server log recorded an action that, in context, appears to be Defendant deleting an email.  (Dkt. 80-6 Ex. 1 at 5.)  Plaintiff has therefore sufficiently indicated "impairment to the integrity of data" under the CDAFA.

Since emotional damages are cognizable under CDAFA § 502(e)(1), it is not necessary to reach the parties' disagreement as to whether any economic damages have been shown.  Similarly, evaluating whether CDAFA's "loss" term encompasses more than economic loss is unnecessary.  Plaintiff has sufficiently provided evidence to support her claim that Defendant's actions caused her substantial emotional distress and that she has an ownership interest in at least some of the data in some of her emails.  Defendant's motion for summary judgment is DENIED as to Plaintiff's SECOND CAUSE OF ACTION.

## C.  INVASION OF PRIVACY

Plaintiff's third cause of action alleges that Defendant's access to her emails constituted an intrusion upon seclusion under California common law.[7]  (Dkt. 69 ¶¶ 36–41.)  The intrusion upon seclusion tort has two elements: "(1) intrusion into a private place, conversation or matter (2) in a manner highly offensive to a reasonable person." *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998).  Defendant argues that

---

[7] Plaintiff does not identify the precise invasion of privacy claim she is making in her complaint.  (Dkt. 69 ¶¶ 36–41.)  However, Defendant analyzes it as an intrusion upon seclusion claim in its motion, (Dkt. 77-1 at 15 n.3), and Plaintiff does not contest such characterization, (Dkt. 80-1 at 17).

Plaintiff has no reasonable expectation of privacy in her Phygen emails and that Plaintiff has failed to produce evidence showing that Defendant used her personal information in a highly offensive manner.

*1. Reasonable Expectation of Privacy.* Defendant argues that Phygen's Computing Policy, which specified that Phygen had access to Plaintiff's emails and prohibited use of Phygen email accounts for personal, private communications, renders unreasonable any expectation of privacy. (Dkt. 77-1 at 16–17.) However, the California Supreme Court has made clear that "privacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy . . . . Privacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion." *Sanders v. Am. Broad. Companies, Inc.*, 20 Cal. 4th 907, 915 (1999). Defendant posits that because Plaintiff's emails were accessible *by Phygen* she lacks a reasonable expectation of privacy *as to Defendant*. The Court rejects his argument. Plaintiff has presented evidence that an iPhone logged as accessing Defendant's Phygen email during Defendant's employment at Phygen also accessed her email from January 2012 until May 2014. In this context, Plaintiff has a reasonable expectation of privacy against an unexpected outsider intruding on each of her emails for nearly two and a half years.

In support of his argument, Defendant argues that this situation is equivalent to an employer accessing an employee's work email. (*See* Dkt. 82 at 17–18 (discussing *TBG Ins. Servs. Corp. v. Superior Court*, 96 Cal. App. 4th 443, 451 (2002) and *Holmes v. Petrovich Dev. Co.*, 191 Cal. App. 4th 1047, 1068–70 (2011)).) The fact-intensive inquiry mandated by California law reveals significant distinctions between the employer/employee paradigm and this case. Most notably, Defendant was not Plaintiff's employer and he was never authorized to access her email. (Dkt. 80-5 ¶ 12.) To

reiterate, Plaintiff has sufficiently demonstrated a reasonable expectation of privacy vis a vis Defendant on the facts in this case. *See Liberty Life Ins. Co. v. Myers*, No. CV 10-2024-PHX-JAT, 2011 WL 3297506, at \*4–5 (D. Ariz. Aug. 1, 2011) (stating that third-party interception of email could be an intrusion on seclusion).

2. *Defendant's Use of Plaintiff's Information.* In addition to his no expectation of privacy argument, Defendant urges the Court to grant summary judgment on Plaintiff's intrusion upon seclusion claim because Plaintiff has not produced any evidence that Defendant *used* information in which she has a privacy interest. (Dkt. 77-1 at 18–19; Dkt. 82 at 19–20.) The Court is not convinced that "use" is a requirement of the intrusion upon seclusion tort. Defendant presents only one California Court of Appeals case that noted "we have found no case which imposes liability based on the defendant obtaining unwanted access to the plaintiff's private information which did not also allege that the *use* of plaintiff's information was highly offensive." *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 993 (2011), as modified (June 7, 2011) (emphasis in original). However, there *are* cases in which intrusion upon seclusion occurred without use. *See, e.g.*, *Sanchez–Scott v. Alza Pharm.*, 86 Cal. App. 4th 365, 377–78 (2001) (a patient adequately stated an intrusion upon seclusion claim where her doctor performed a breast examination in front of a pharmaceutical salesperson without revealing that the salesperson was not a medical professional). The Restatement also "expressly disavows" any such limitation. *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1061 n.23 (N.D. Cal. 2014) (citing Restatement 2d of Torts § 652B, Comment b ("The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.")). Plaintiff has sufficiently supported her intrusion upon seclusion claim without additional evidence as to Defendant's use of her information.

//

Furthermore, even if use were an element of intrusion upon seclusion, the two district court opinions that cite *Folgelstrom* do so with nuanced language not inconsistent with this Court's holding. The first case, *Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*, 957 F. Supp. 2d 1135, 1154 (C.D. Cal. 2013), *aff'd on other grounds*, 635 F. App'x 351 (9th Cir. 2015), involved consumer class actions alleging invasion of privacy through a credit card company's disclosure of applicants' zip codes. *See id.* at 1137, 1154. The court cited *Folgelstrom* and granted summary judgment for the company, characterizing Plaintiff's argument that the company's zip code disclosure left them vulnerable to identity theft (presumably by third parties) as a "speculative conclusion of fact." *Id.* at 1154. Statements of increased risk, without more, were insufficient. *Id.* at 1154. The second case, *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1035–36 (N.D. Cal. 2014), involved a former employee who forgot to turn off syncing between his former-employer-provided iPhone and his personal iCloud account after he took a job with a competitor. *Id.* at 1028–29. The court dismissed the former employee's invasion of privacy claim because the former employee had offered "no factual support for . . . conclusory assertions" and provided "no details regarding the specific conduct . . . that amounts to accessing, intercepting, monitoring, reviewing, storing, and using" his private electronic data. *Id.* at 1036.

This case is starkly different. Plaintiff presents extensive evidence that Defendant invaded her privacy, not that his actions merely increased her risk for invasion of privacy. Her expert's analysis is deeply troubling and suggests a multi-year continual window into Plaintiff's private affairs. Plaintiff has adequately supported her claim for invasion of privacy, and accordingly the Court DENIES Defendant's motion for summary judgment as to Plaintiff's THIRD CAUSE OF ACTION.

//

//

**D.     WIRETAP ACT**

Plaintiff's fourth cause of action alleges that Defendant's access to her emails via Phygen's server violated a second section of the ECPA, referred to as the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2712.  (Dkt. 69 ¶¶ 42–51.)  The SCA provides a cause of action "against [1] any person [who] [a] intentionally accesses without authorization a facility through which an electronic communication service is provided, or [b] intentionally exceeds an authorization to access that facility; and [2] thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system."  18 U.S.C. § 2701(a).  Defendant argues that Plaintiff's SCA claim is barred because Phygen's exchange server is not a "facility" providing an "electronic communication service."  (Dkt. 82 at 20–23; Dkt. 77-1 at 19–22.)  Rather, he argues, "facilities" are only third-party providers that facilitate private stored internet communications.  (Dkt. 77-1 at 20.)

The reach of 18 U.S.C. § 2701(a) turns on the construction of both "facility" and "electronic communication service."  Though the SCA does not define the term "facility," it defines an "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15) (incorporated by reference in 18 U.S.C. § 2711(1) of the SCA).

The "interaction between the terms . . . is admittedly a little unwieldy."  *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 335 (D.D.C. 2011).  "The difficulty in interpreting the statute is 'compounded by the fact that the [SCA] was written prior to the advent of the Internet and the World Wide Web.  As a result, the existing statutory framework is ill-suited to address modern forms of communication.'"  *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 981 (C.D.

-17-

Cal. 2010) (quoting *Konop*, 302 F.3d at 873).  As the Ninth Circuit further observed, "until Congress brings the laws in line with modern technology, protection of the Internet and websites such as [these] will remain a confusing and uncertain area of the law." *Konop*, 302 F.3d at 874.  Courts applying the SCA generally agree that the paradigmatic examples of "facilities" are telephone companies, internet or email service providers, and electronic bulletin board systems.  *See, e.g.*, *Crispin*, 717 F. Supp. 2d at 981 (citing *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003)).

Contrary to Defendant's argument, "facility" can and here does include local, privately owned servers.  "The language chosen by Congress captures any service that stands as a 'conduit' for the transmission of wire or electronic communications from one user to another."  *Council on Am.-Islamic Relations Action Network, Inc.*, 793 F. Supp. 2d at 334 (citing *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 902 (9th Cir. 2008)).  The caselaw generally falls on a spectrum: "[o]n the one hand, the statute clearly is triggered when a defendant directly or indirectly accesses the physical server-side computer dedicated to running an e-mail client by, for instance, downloading e-mails from the server.  On the other hand, the statute clearly is not triggered when a defendant merely accesses a physical client-side computer and limits his access to documents stored on the computer's local hard drive or other physical media." *Id.*

The Court rejects Defendant's narrow reading of "facility."  Phygen's servers ran Microsoft Exchange and enabled Phygen employees with credentials to access their emails and send electronic communications to others.  (Dkt. 82-1 ¶¶ 90, 96, 104–12.)  For Plaintiff, the Phygen server was a facility through which her emails travelled under the SCA.  This broader understanding of "facility" accords with holdings in many similar cases.  *See, e.g.*, *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1104 (9th Cir. 2014) (the SCA "covers access to electronic information stored in third party computers"); *Konop*, 302 F.3d at 874 (concluding that secure bulletin board ran by private individual was

covered by the SCA); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1071 (9th Cir. 2004) (pleading is sufficient if the "substance of plaintiffs' claims is that defendants improperly accessed . . . servers"); *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 449 (C.D. Cal. 2007) (noting that "emails stored on a remote server" would qualify as a SCA facility); *In re Nickelodeon Consumer Privacy Litig.*, No. CIV.A. 12-07829, 2014 WL 3012873, at *16 (D.N.J. July 2, 2014) ("The SCA thus protects individuals from the unauthorized acquisition or modification of certain of their communications while those communications are stored on someone else's computer."); *In re Pharmatrak Privacy Litig.*, 220 F. Supp. 2d 4, 13 (D. Mass. 2002), *rev'd on other grounds*, 329 F.3d 9 (1st Cir. 2003) (personal computer must perform "server-like functions" in order to become "facility through which an electronic communications service is provided"); *Becker v. Toca*, Civil Action No. 07–7202, 2008 WL 4443050, *4 (E.D. La. Sept. 26, 2008) (declining to dismiss a claim under the SCA since the fact that plaintiff used personal and office computers in his business might qualify them as SCA facilities); *Kaufman v. Nest Seekers, LLC*, No. 05 CV 6782(GBD), 2006 WL 2807177, *6 (S.D.N.Y. Sept. 26, 2006) ("An on-line business which provides its customers, as part of its commercial offerings, the means by which the customers may engage in private electronic communications with third-parties may constitute a facility through which electronic communication service is provided"); *Cornerstone Consultants, Inc. v. Prod. Input Sols., L.L.C.*, 789 F. Supp. 2d 1029, 1049–50 (N.D. Iowa 2011) ("[T]he pertinent 'facility through which an electronic communication service is provided' is plausibly, at the very least, an e-mail server."); *Devine v. Kapasi*, 729 F. Supp. 2d 1024, 1028 (N.D. Ill. 2010) (finding plaintiff sufficiently alleged the existence of an electronic communication service provider where it alleged that the network at issue "provide[d] authorized users with the ability to transmit and receive electronic communication by on-site or remote access, through password protected accounts—including . . . the ability to send and receive e-mail"); *Int'l Bhd. of Elec. Workers, Local 134 v. Cunningham*, No. 12 C 7487, 2013 WL 1828932, at *4 (N.D. Ill. Apr. 29, 2013) (finding plaintiff adequately alleged that it was an electronic

communication service provider by alleging that defendant "accessed a database stored on Plaintiff's computer network and servers," and "unlike a simple hard drive, networks and servers can provide an electronic communication service. For example, the server could run an e-mail client"); *Pascal Pour Elle, Ltd. v. Jin*, 75 F. Supp. 3d 782, 788 (N.D. Ill. 2014) ("At this stage, it is sufficient that Plaintiff has alleged that the Rosy Salon website restricts its access to registered users and provides its users with an email and text messaging function. The fact that users must independently connect to the internet to access the site and its offered functions is not fatal to Plaintiff's complaint."); *Brown Jordan Int'l, Inc v. Carmicle*, No. 0:14-CV-60629, 2015 WL 11660246, at *4 (S.D. Fla. June 3, 2015) (The SCA "encompasses employee email accounts and cloud-based storage systems accessed through the Internet."); *cf. Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270 (N.D. Cal 2001) (holding that an online merchant with a website that only allowed customers to send electronic communications directly to the merchant does not provide electronic communication services within the contemplation of the SCA); *Shefts v. Petrakis*, No. 10-CV-1104, 2013 WL 489610, at *4 (C.D. Ill. Feb. 8, 2013) ("Access2Go's company server, was even less a [facility] as it does not enable a person to use text messaging, but was simply the place Defendants chose to store the messages they had captured.").

Defendant relies on cases that hold that owners of improperly accessed servers or devices cannot bring SCA claims since their servers or devices are not SCA facilities. (*See* Dkt. 82 at 21–22.) In those cases, plaintiffs argued that the SCA applied since their devices were used by third parties to access and send electronic communications. *See K.F. Jacobsen & Co. v. Gaylor*, 947 F. Supp. 2d 1120, 1126 (D. Or. 2013) ("Jacobsen argues that because it allows third parties to send or receive wire or electronic communications through its computer terminals, [the SCA applies]. . . . Jacobsen's Internet provider qualifies as the provider of 'electronic communication services' for Jacobsen, while Jacobsen is properly characterized as a user of that service."); *Noel v.*

*Hall*, Civ. No. 99–649–AC, 2012 WL 3241858, at *8 (D.Or. April 27, 2012) (Plaintiff Noel provided telephone, computer, and fax services to three businesses and routinely tape-recorded calls made to the businesses as back-ups of the original calls.  The court held, "in the context of the present matter, a provider of an 'electronic communications service' would be Noel's telephone carrier, whereas he himself would qualify as a user of that service."); *see also Associated Pump & Supply Co., LLC v. Dupre*, No. CIV.A. 14-9, 2014 WL 1330196, at *6–7 (E.D. La. Apr. 3, 2014) ("Plaintiff contends that the service at issue is 'e-mail service,' but . . . still does not allow the Court to decipher whether Plaintiff internally provided email services, or whether they contracted with a provider, which is a critical determination in this matter.").

*Gaylor* and *Noel* are akin to the multitude of cases that hold that end users cannot bring SCA claims for intrusions into their devices because the SCA delineates between users and providers; one cannot be both.  *See, e.g.*, *Cousineau v. Microsoft Corp.*, 6 F. Supp. 3d 1167, 1175 (W.D. Wash. 2014); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1271 (N.D. Cal. 2001) ("[T]he success of Crowley's argument depends on a holding that computers of users of electronic communication service, as opposed to providers of electronic communication service, are considered facilities through which such service is provided.  This argument seems destined to failure, especially in light of the fact that all one needs to render access to such a facility authorized is consent by a provider of an electronic communication service.  *See* 18 U.S.C. 2701(c)(1).  It would certainly seem odd that the provider of a communication service could grant access to one's home computer to third parties, but that would be the result of Crowley's argument.").

However, this case is different.  The question is not whether Phygen can bring a SCA claim against Defendant but rather whether Plaintiff can do so.  Plaintiff is not arguing that her work computer or her iPhone constitute SCA facilities but rather that

Phygen's server is an SCA facility and Phygen email is the electronic communication service.  Clearly, as to her, Phygen is a third-party provider of electronic communications services.  *See Garcia v. Haskett*, No. C 05-3754 CW, 2006 WL 1821232, at *5 (N.D. Cal. June 30, 2006) (allegations of accessing emails on a third-party hosted or maintained server suffice for SCA claims).  Plaintiff's expert indicates that the iPhone associated with Defendant searched Plaintiff's email account on Phygen's server thousands of times; Defendant's expert opines that the iPhone would access emails from the Phygen server's storage.  (Dkt. 80-6 Ex. 1 at 13; Dkt. 77-8 Ex. A at 11.)  As discussed above, Plaintiff has an ownership interest in those emails.  For those reasons, Defendant's motion for summary judgment is DENIED as to Plaintiff's FOURTH CAUSE OF ACTION.

### E.  PREEMPTION

Defendant's motion also argues that if Plaintiff's SCA claim survives, it expressly preempts her state law claims.  (Dkt. 77-1 at 19 n.5.)  Supporting preemption, Defendant cites the SCA and ECPA's statements that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."  18 U.S.C. § 2708 (SCA); *see also* 18 U.S.C. § 2518(10) (ECPA) (same). Though Defendant does not state the type of preemption, he seems to claim express preemption.

Both provisions were added to the SCA and ECPA "for a limited purpose: to prevent criminal defendants from suppressing evidence based on electronic communications or customer records obtained in violation of ECPA's provisions."  *In re Nat'l Sec. Agency Telecommunications Records Litig.*, 483 F. Supp. 2d 934, 939 (N.D. Cal. 2007) (citing S. Rep. No. 99-541, U.S. Code Cong. & Admin. News 1986, p. 3555, 3577 ("The purpose of this provision is to underscore that . . . the Electronic Communications Privacy Act does not apply the statutory exclusionary rule contained in

-22-

title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the interception of electronic communications.") and H.R. Rep. No. 99-647 at 75 (1986) (SCA discussion incorporating ECPA discussion by reference)); *see also United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) (noting that the Stored Communications Act expressly rules out exclusion as a remedy); *Leong v. Carrier IQ Inc.*, No. CV 12-01562 GAF MRWX, 2012 WL 1463313, at *4–5 (C.D. Cal. Apr. 27, 2012) ("In this Court's view, that provision does not even impact the question of preemption, but rather focuses on the scope of available federal remedies when a violation of the statute has been established."); *In re Google Street View Electronic Comm'ns Litig.*, 794 F. Supp. 2d at 1085 n.12 ("The legislative history supports the proposition that the provision was appended to the ECPA solely to address suppression of evidence by criminal defendants."); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011) (The "passage from the ECPA does not explicitly provide for the preemption of state law, which is the bar that must be met before express preemption may be found.").

Some courts have held otherwise. *See, e.g.*, *Bunnell*, 567 F. Supp. 2d at 1154 (finding that ECPA presents both express and field preemption); *Quon v. Arch Wireless Operating Co., Inc.*, 445 F. Supp. 2d 1116, 1137–38 (C.D. Cal. 2006), *aff'd in part, rev'd in part*, 529 F.3d 892 (9th Cir. 2008), *rev'd and remanded on other grounds sub nom. City of Ontario, Cal. v. Quon*, 560 U.S. 746 (2010) (granting summary judgment on the plaintiff's invasion of privacy and state constitutional claims because of the SCA's express "preemptive effect"); *Muskovich v. Crowell*, 1995 WL 905403, at *1 (S.D. Iowa March 21, 2005) ("In section 2708, Congress unequivocally expressed an intent to 'occupy the field' and provide the exclusive remedies for conduct regulated by ECPA."). Others have rejected express preemption but found field preemption. *See In re Google Inc. Street View*, 794 F. Supp. 2d at 1084–85; *cf. White v. Baker*, 696 F. Supp. 2d 1289, 1298 (N.D. Ga. 2010) ("The SCA does not expressly, or impliedly, comprehensively

regulate the field of internet communications, communication means, or communication storage."); *Lane v. CBS Broad. Inc.*, 612 F. Supp. 2d 623, 637 (E.D. Pa. 2009) (same).

The caselaw, read as a whole, reveals that courts which find preemption often do so when facing conflicts between state and federal law. *See, e.g.*, *Quon*, 445 F. Supp.2d at 1137–38; *Bunnell*, 567 F. Supp.2d at 1153–54; *Telecommunications Regulatory Bd. of Puerto Rico v. CTIA-Wireless Ass'n*, 752 F.3d 60, 68 (1st Cir. 2014); *United States v. Carrazana*, 921 F.2d 1557, 1563 (11th Cir. 1991). In this case, by contrast, California and Federal law align. The SCA intends to establish minimum standards of protection; California is free to enact more restrictive legislation. Accordingly, Plaintiff's SCA claim does not expressly preempt her state law claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to Plaintiff's FIRST CAUSE OF ACTION and DENIED as to Plaintiff's remaining claims.

DATED: October 13, 2016

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE